**Case No. 25-20331**

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff - Appellee

v.

HIEU TRUONG, REGISTERED PHARMACIST,
Defendant - Appellant

On Appeal From The United States District Court
For The Southern District of Texas
Case No. 4:19-cr-00677
The Honorable Andrew S. Hanen

# BRIEF FOR DEFENDANT-APPELLANT HIEU TRUONG

BEAU B. BRINDLEY
BLAIR T. WESTOVER

53 W. Jackson Blvd. #1410
Chicago, IL 60604
(312) 765-8878

ATTORNEYS FOR
DEFENDANT-APPELLANT

**No. 25-20331 UNITED STATES v. TRUONG**

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of these proceedings. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

**Attorneys for appellant HIEU TRUONG:**

**Law Offices of Beau B. Brindley**
Beau B Brindley
Michael J. Thompson
Edward McDavid
Blair T. Westover

**Attorneys for Appellee The United States of America:**

Carmen Castillo Mitchell
Jeremy Raymond Sanders
Devon Morel Helfmeyer
Andrew Paul Tamayo
Courtney Mitchell Chester
Monica Cooper Napier
Stephanie Coon Bauman

s/Beau B. Brindley
Attorney of record for Defendant-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Undersigned counsel requests oral argument to assist the Court in deciding the multiple complex issues regarding the standard required for conviction of a registered pharmacist under 18 U.S.C. §841.

# TABLE OF CONTENTS

**JURISDICTIONAL STATEMENT ........................................ 1**

**STATEMENT OF ISSUES ........................................ 1**

**STATEMENT OF THE CASE ........................................ 1**

**SUMMARY OF THE ARGUMENT ........................................ 21**

**ARGUMENT ........................................ 24**

**I. THE GOVERNMENT DID NOT PRESENT SUFFICIENT EVIDENCE TO ESTABLISH THAT MR. TRUONG KNEW THE CHARGED PRESCRIPTIONS TO BE COUNTERFEIT.. ........................................ 24**

**II. JURY INSTRUCTIONS ISSUED IN THIS CASE DID NOT CAPTURE THE FULL MENS REA REQUIRED BY RUAN V. UNITED STATES NOR CORRECTLY STATE THE STANDARD FOR DETERMINING WHEN A PHARMACIST ACTS IN AN UNAUTHORIZED MANNER IN FILLING A PRESCRIPTION. ........................................ 32**

**CONCLUSION ........................................ 45**

# TABLE OF AUTHORITIES

**Cases**

*Bond v. United States*, 134 S. Ct. 2077 (2014) ....................................................39

*Cheek v. United States*, 498 U.S. 192 (1991) ........................................... 29, 35, 36

*Crandon v. United States Boeing Co., Inc.*, 494 U.S. 152 (1990)...........................40

*Fahey v. Mallonee*, 332 U.S. 245 (1947)...........................................................40

*Gonzales v. Oregon*, 546 U.S. 243 (2006)..........................................................40

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)..........................................................39

*Hawker v. New York*, 170 U.S. 189 (1898)..........................................................39

*Jackson v. Virginia*, 443 U.S. 307 (1979)............................................................24

*Liparota v. United States*, 471 U.S. 419 (1985) ....................................... 34, 35, 37

*Mistretta v. United States*, 488 U.S. 361 (1989)....................................................40

*Ruan v. United States*, 597 U.S. 507 (2022)........... 23, 29, 33, 34, 35, 36, 40, 41, 45

*United States Telecom Assn. v. FCC*, 855 F.3d 381 (CADC 2017) ........................38

*United States v. Ajayi*, 64 F.4th 243 (5th Cir. 2023) ............................................32

*United States v. Burton*, 126 F.3d 666 (5th Cir. 1997)...........................................29

*United States v. Capistrano,* 74 F.4th 756 (5th Cir. 2023).....................................43

*United States v. Davis*, 53 F.4th 833 (5th Cir. 2022)................................ 24, 32, 37

*United States v. Ferris*, 52 F.4th 235 (5th Cir. 2022) ............................................32

*United States v. Fitzharris*, 633 F.2d 416 (5th Cir. 1980) ......................................25

*United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018) ................................ 26, 27, 31

*United States v. Lamartiniere*, 100 F.4th 625 (5th Cir. 2024)............. 23, 32, 33, 41

*United States v. Martinez*, 131 F.4th 294 (5th Cir. 2025) ......................... 24, 29, 32

*United States v. Miles*, 360 F.3d 472 (5th Cir. 2004) ............................................24

*United States v. Montes*, 602 F.3d 381 (5th Cir.2010) ..........................................32

*United States v. Oti*, 872 F.3d 678 (5th Cir. 2017)...................................................25

*United States v. Pennington*, 20 F.3d 593 (5th Cir. 1994).......................................24

*United States v. Pettigrew*, 77 F.3d 1500 (5th Cir. 1996) ............................... 25, 32

*United States v. Phea*, 755 F.3d 255 (5th Cir. 2014)...............................................32

*United States v. Robel*, 389 U.S. 258 (1967) .........................................................40

*United States v. Touby*, 500 U.S. 160 (1991) .........................................................39

*United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014) ..................... 25, 26

*W. Virginia v. Env't Prot. Agency,* 142 S. Ct. 2587 (2022) ....................................38

**Statutes**

21 U.S.C. §823 ........................................................................................................37

21 USC §841 ...........................................................................................................37

21 USCA §841 .........................................................................................................34

42 U.S.C. §1395 ......................................................................................................39

**Other Authorities**

H.R. Rept. 91-1444 ..................................................................................................38

**Regulations**

21 C.F.R §1306.04 ....................................................................................................42

## JURISDICTIONAL STATEMENT

1. Subject Matter Jurisdiction in the District Court. This case arose from the prosecution of an offense against the laws of the United States of America. The district court had jurisdiction under 18 U.S.C. § 3231.

2. Jurisdiction in the Court of Appeals. This is a direct appeal from a final decision of the U.S. District Court for the Southern District of Texas, Houston Division, entering judgment of conviction and imposing a criminal sentence. This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742.

The district court entered written judgment imposing a 42-month term of imprisonment on April 6, 2025, and Appellant filed notice of appeal April 18, 2025, which complies with Fed. R. App. P. 4.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the government presented sufficient evidence that the defendant had knowledge that the charged prescriptions were counterfeit and that filling said prescriptions was outside his authority as a pharmacist licensed under the Controlled Substances Act ("CSA").

2. Whether the jury instructions issued by the district court were consistent with the requirements of the CSA and *Ruan v. United States*, 597 U.S. 507 (2022).

## STATEMENT OF THE CASE

## A. INDICTMENT AND PROCEDURAL HISTORY

This case concerns the prosecution of a licensed and registered pharmacist for allegedly distributing controlled substances in violation of 18 U.S.C. § 841. The government alleged that two sisters, Diana and Kathy Hernandez, opened S&S Pharmacy for the purpose of allowing local drug dealers (including Charles Walton, Prince White and Clint Russel) to fill counterfeit prescriptions. Diana and Kathy Hernandez hired the defendant-appellant Hieu Truong to work as the pharmacist at S&S Pharmacy.

The prescriptions charged in this case were written in the name of actual doctors but were otherwise entirely counterfeit. ROA.3043. That fact was not in dispute at trial. Nor was it in dispute that Mr. Truong filled the charged prescriptions. The only question at trial was whether Mr. Truong knew that the three prescriptions at issue in this case were counterfeit at the time he filled them.

Mr. Truong was originally indicted for conspiracy to distribute a controlled substance (Count One) and three substantive distribution counts (Counts Two, Three, and Four). ROA.49. Mr. Truong's first trial took place in May of 2022. He was acquitted of conspiracy and convicted of the three substantive counts. ROA.15. Following the Supreme Court's decision in *Ruan v. United States*, 597 U.S. 507 (2022), the district court granted Mr. Truong's Rule 33 Motion and vacated Mr. Truong's conviction on those counts. ROA.21.

Mr. Truong was subsequently tried before a jury on the three substantive distribution counts (Counts Two, Three, and Four). Count Two involved a prescription purportedly written by Dr. T.R. and filled on March 26, 2019. Those prescriptions were provided to Charles Walton. Count Three involved prescriptions purportedly written by Dr. J.D. that were filled on July 23, 2019, and provided to Prince White. Count 4 involved prescriptions purportedly written by Dr. J.D. and Dr. E.E. that were also filled on July 23, 2019, and provided to Mr. Clint Russel. ROA.49. Mr. Truong was acquitted of Count Two and convicted on Counts Three and Four. ROA.989.

Mr. Truong was sentenced to 42 months on Counts Three and Four. ROA.990. Mr. Truong now appeals the sufficiency of the evidence presented at trial and the accuracy of the jury instructions issued in this case.

### B. Facts Presented At Trial

Diana and Kathy Hernandez had previously worked for a corrupt pharmacy that distributed controlled substances to known street level drug dealers. ROA.3036-3037. During that time, Diana Hernandez developed relationships with several drug dealers. ROA.3036-3037. When that pharmacy was shut down, the Hernandez sisters decided to open a new pharmacy with the same goal. ROA.3037.

Kathy Hernandez worked at the front desk collecting and distributing the prescriptions. Diana Hernandez's role appears to be mainly in coordinating with

the street dealers to whom the medications would be distributed. Neither sister held a pharmacist license. Before opening S&S Pharmacy, Ms. Kathy Hernandez first reached out to a pharmacist with whom she had previously worked. ROA.3037-3038. That person refused to participate in the scheme. *Id*. In 2017, approximately six months before S&S pharmacy opened, Kathy Hernandez placed an advertisement on Craig's List seeking the service of a pharmacist. ROA.2783. Mr. Truong answered the ad. He sent Kathy Hernandez a detailed resume. ROA.3039.

Mr. Truong had no prior experience working in retail pharmacy. ROA.3006. His prior experience was limited to working in institutional pharmacies, specifically, a veteran's hospital and prison. ROA.3006. The government's expert witness agreed that "there are significant differences in how [retail and institutional pharmacies] operate." ROA.3363. In institutional pharmacies "the prescriptions come directly from the medical [doctor] to the pharmacist." ROA.3364. Institutional pharmacists "don't receive prescriptions." ROA.3365. The government's expert further agreed that "a person's prior work experience impacts their thinking." ROA.3365. Mr. Truong was unfamiliar with work in a retail pharmacy. He had no prior experience filling paper prescriptions. Text messages between Diana and Kathy Hernandez are replete with evidence that Mr. Truong did not know how to perform basic tasks that are routine in retail pharmacy practice.

ROA.3093-3094. ROA.3171. Ms. Hernandez, by contrast, had 8 years of retail pharmacy experience; a fact she pointed out to Mr. Truong. ROA.3007. The government's expert admitted that "a pharmacist without any experience in retail pharmacy might be more easily deceived than one that was more savvy in that business". ROA.3370.

The drug dealers, in coordination with Kathy Hernandez, oversaw creating the forged prescriptions, stealing or forging driver's licenses and providing medical history forms that justified the prescriptions to be issued. Kathy Hernandez and the pharmacy technician Ashlee Moreno would greet customers, take their documentation and payment, and send the prescriptions back to Truong to be filled. ROA.3018. Mr. Truong would check the prescriptions and compare that to the customer background survey and fill the prescriptions. The prescriptions were then bagged and distributed by Kathy Hernandez or Ms. Moreno. Mr. Truong was in the back when customers arrived and when the medications were bagged. ROA.3018. ("And the vast majority of the time, almost all the time, Tom was not out there when the items were put in the bags at all, right? A Correct.").

Kathy Hernandez agreed that Mr. Truong is "rather meek and nonconfrontational." ROA.3196-3197. She admitted that she "took advantage of those characteristics to get things past him". ROA.3197. Ms. Hernandez never told Mr. Truong that the prescriptions that would be given to Mr. Truong to fill were

forgeries. ROA.3006. In fact, she agreed that she repeatedly took active steps that "led him to believe that this was a legitimate pharmacy which was going to be filling prescriptions for controlled substances that were written by doctors." ROA.3006. Ms. Hernandez never told Mr. Truong that Cedric Milburn, Dexter Lard, or any of the other individuals who came into S&S pharmacy were drug dealers. ROA.3010.

Ms. Hernandez never observed Mr. Truong taking any steps to avoid gaining knowledge of the true nature of the S&S Pharmacy "customers." ROA.3225. ("Q. From what you observed, did you ever see him take steps to avoid learning things? A. No."). To the contrary, when Mr. Truong began working at S&S Pharmacy, he instituted a number of protocols in an attempt to guard against filling unwarranted prescriptions. Mr. Truong created a "due not fill" list documenting suspicious doctors and patients. ROA.3055; ROA.2647-2648 (Gov.Ex.5). He asked Ms. Hernandez to check the prescriptions against the do-not-fill list. ROA.3056. The government's expert witness on pharmacy practice agreed that it is "common for a pharmacist to rely on the staff to do certain things". ROA.3371.

Mr. Truong required that every patient fill out a patient history describing their ailment and medication history. ROA.3148-3149. Mr. Truong checked the Prescription Monitoring Program database to make sure that the patients were not receiving inconsistent medications. He checked patient IDs to make sure they

matched the information on the prescriptions. ROA.3014. He either directed pharmacy employees to call the doctor's phone number listed on the prescription to verify a its validity or he personally made those calls to the doctor's phone number listed on the prescription to verify a prescription's validity. ROA.3020

When a prescription from a new doctor was presented to S&S Pharmacy, Mr. Truong would verify the doctor's DEA number and check the address on the prescription to make sure it matched the DEA website. ROA.3083; ROA.3239.

Mr. Truong was not simply going through the motions. Text messages show Kathy Hernandez complaining to her sister about how long it takes Mr. Truong to fill a prescription. According to Ms. Hernandez, after Mr. Truong checks the PMP, he performs his own verification process, which takes "about an hour." ROA.3104. Mr. Truong would literally inspect the IDs and prescriptions with a magnifying glass. ROA.3042 ("Q Okay. When the prescriptions would come into the pharmacy, you would see Tom in the back room inspecting them with his magnifying glass, right?". A. Correct."). For example, on one occasion Mr. Truong was given a prescription for a patient with a date of birth in 1948. The drug dealers who counterfeited the prescriptions and drivers licenses used the photo of a 20-year-old. Mr. Truong caught the inconsistency and refused to fill the prescription. ROA.3014.

> Q. Okay. But in reality we know from all of the text messages that we've reviewed that in practice Tom checked ID cards, right?

> A. Yes.
> Q. Tom required DEA number checks, right?
> A. Yes.
> Q. Tom required PMP checks, right?
> A. Yes.

ROA.3239. Text exchanges between the Hernandez sisters are replete with examples of Mr. Truong attempting to put in place procedures to verify the legitimacy of prescriptions and the sisters actively working to undermine those efforts. For example, when Mr. Truong discovered inconsistencies in the IDs or customer background forms, Ms. Hernandez had to call the drug dealers and coach them on how to create more convincing forgeries:

> "'And Diana's talking about telling Dex that if he keeps making that mistake: (As read) Tom going to want to see who's coming in and why we aren't checking.' Right? A Correct. Q So what Diana tells you, after Tom refuses to fill, is Diana tells you that you need to tell Dexter Lard that he keeps making mistakes like this, if he does, that Tom's going to want to get more information about who's coming in, right? A Correct.".

ROA.3014. On at least 50 occasions Mr. Truong refused to fill prescriptions based on some problem with the IDs. ROA.3014.

Kathy Hernandez agreed that she had "multiple text conversations" with her sister "about making sure that [Mr. Truong] wasn't there and didn't get to see what you were putting in the bag." ROA.3018. Ms. Hernandez admitted that Mr. Truong did not know that a group of prescriptions were dropped off by a single individual. ROA.3237. Ms. Hernandez told Mr. Truong that patients came in

individually to drop off and pick up prescriptions. ROA.3238. Diana Hernandez repeatedly directed her sister to hide anything regarding bagging from Mr. Truong. ROA.3166 (“Q. And then Diana says ‘Tom shouldn't even be hearing you. Shouldn't know nothing when it comes to bagging. If he's around her when it's time to get out the bags, then wait and tell them to come back. If he's around when she want to bag, don't bag."). Kathy actively prevented Mr. Truong from being the first person to review a “customer’s” paperwork, ROA.3148-3149, or being the first person to directly interact with “customers.”

On at least one occasion when Mr. Truong placed a doctor on the “do-not-fill list” some other person at S&S Pharmacy would re“verify” the doctor’s credibility and remove the name. For example, the government admitted into evidence Government Exhibit 614 which included a list of 294 controlled substances prescriptions dispensed by S&S Pharmacy after a Dr. Richmond (Count Two) was placed on the do not fill list. ROA.2651. However, the do not fill list was updated to state, “"Call Michelle Williams/System Updated, verified new scripts for doc". ROA.2673.

Because the putative patients did not exist, Ms. Hernandez had to instruct the drug dealers on how to fill out the Health Questionnaires. Ms. Hernandez hid from Mr. Truong her interactions with those “patients.” ROA.3062.

> “Q And you agree that the prescriptions were supposed to appear as real as possible, right?

> A Correct.
> Q Because Tom was going to be looking at them, right?
> A Correct.
> Q Tom wasn't a corrupt pharmacist, right?
> A Correct.
> Q So they needed to look good enough to fool Tom and his magnifying glass, right?
> A Yes."

ROA.3043. Ms. Hernandez reviewed the paperwork to make sure that Mr. Truong wouldn't reject it and rushed any less convincing health questionnaires out the door before Mr. Truong could review them. ROA.3086-3087.

Nor did Mr. Truong simply accept the prescriptions' veracity at face value. He went to outside sources. Prescriptions include the name, address, and phone number of the authoring physician. Mr. Truong implemented a policy to always verify prescriptions with the doctor prior to filling (at least until S&S Pharmacy had developed a long history with the doctor). ROA.3044. Mr. Truong "continually" called the number on the prescription to verify its validity or directed Ms. Hernandez or Ms. Moreno to do the same. ROA.3020-3021. He would ask the doctors to justify the strength and dosage of the prescription. ROA.3045-3046. Ms. Hernandez would fake those calls by pretending she was speaking with a physician, when, in fact, her sister was on the other end of the line. ROA.3043-3044, ROA.3046. In one text Kathy Hernandez tells her sister that she is going to call because her "fake signature" needs approval. ROA.3085.

Sometimes Mr. Truong would make the verification call himself. If no one answered the phone on the purported prescription, it would not be filled. ROA.3051.

Ms. Hernandez went so far as having the street dealers recruit people to answer the phone number listed on the prescription and pose as nurses or doctors.

> "Q Okay. And the only reason he was doing that, as far as you can understand, was to make sure the prescription was really good, right?
> A Correct."

ROA.3048. Ms. Hernandez admitted:

> "Q If you really believed that Tom thought or he knew these prescriptions were all fakes, the idea of that pretend conversation wouldn't make a lick of sense, would it? A No."

ROA.3058. At times, Mr. Truong would require that the prescriptions be verified not only over the phone but by fax. This implemented a new set of obstacles for the sisters. ROA.3096.

> "Q And then Diana said: (As read) He's getting annoying. He can't decide how a doctor signs? There's no correct way for a doctor to sign. He doesn't need to question everything. Right?"

ROA.3097. Ms. Hernandez testified that Mr. Truong repeatedly frustrated the scheme by refusing to fill prescriptions for a multitude of reasons. ROA.3053.

Daily, Mr. Truong generated daily usage reports that recorded the controlled substances disturbed by S&S Pharmacy. Ms. Hernandez would change that log when Mr. Truong was not around. ROA.3064-3065. Ms. Hernandez also altered

the Daily Use Reports that were sent to the wholesaler pharmaceutical companies behind Mr. Truong's back. ROA.3099.

There were times when Mr. Truong would want to report suspicious behavior to the DEA. ROA.3063. Ms. Hernandez worked to try to convince him not to do so. ROA.3063. On at least one occasion she was unsuccessful and Mr. Truong did report to the DEA what he believed to be a fake prescription. ROA.3063.

In July 2019, Ms. Hernandez learned that people were cooperating with the DEA. In response she went into the pharmacy before Mr. Truong so that she could clean it out before he saw anything incriminating. ROA.3182-3183.

Mr. Truong's efforts were a joke to Kathy and Diane Hernandez.

> "Q. And then you and your sister continually made fun of him behind his back for trying to follow the rules, didn't you?
> A I did.
> Q It was funny to you that Tom Truong was trying to follow the rules because you knew that it was all a sham, right?
> A. Correct.
> Q So you and your sister knew you set up a sham business. You thought it was real funny to watch him try his best to figure out how to follow the rules, right?
> A Yes."

ROA.3004-3005.

> "Q And you and your sister made fun of him behind his back for trying so hard, right?
> A Correct.
> Q Even though that you knew he wasn't aware of what was going on and just trying to do his job?

` A Correct."

ROA.3042. Text messages between the sisters are replete with instances where the two are ridiculing Mr. Truong's attempt to engage in legitimate quality control, follow the rules and being in Ms. Kathy Hernandez's words "picky AF" about protocol. ROA.3076, 3068-3086. They make fun of him for generally being a "nerd." ROA.3158. Ms. Hernandez complains that "No one has time for his extra ways when he should be worrying about his own shit in the back." ROA.3161.

Mr. Truong was convicted on counts Three and Four. Those counts involve prescriptions filled at S&S Pharmacy on July 23, 2019. Count Three involves prescriptions provided to street dealer Prince White. Count 4 involves prescriptions provided to street Dealer Clint Russel. ROA.49. Those drugs were seized during traffic stops. ROA.2693-2694, ROA.2701. Each prescription was filled by Mr. Truong. ROA.2703-2707.

Dr. Durand testified that he did not issue any of the prescriptions filled under his name at S&S pharmacy. ROA.2661, ROA.2665-2666. Dr. Durand reported that his DEA number had been stolen. As a result, his DEA number was retired on May 8, 2018, and a new one issued. ROA.2656. Many prescriptions were filed at S&S pharmacy under Dr. Durand's number prior to the DEA number being retired. ROA.2675-2676.

Investigator Morgan testified that a pharmacist could determine if a DEA number had been retired by checking the DEA website, which maintained a list of retired DEA numbers. ROA.2675. This appears to be separate and distinct from simply checking a physician's number on the prescription monitoring program. To discover that a DEA number is retired a pharmacist must physically take the opportunity to go to a DEA website and check the individual DEA numbers. ROA.2675. Investigator Morgan admitted that there is no rule or law that requires a pharmacist to check for a retired DEA number every time a prescription is issued. ROA.2678-2679.

The government's expert witness, Ms. Salinas, for her part did not mention the DEA website, but agreed that best practices would be for a pharmacist verifying a prescription to "run a Google search [of the doctor] to see if the phone number on the search matches the number on the prescription." ROA.3369. Ms. Salinas also acknowledged that the DEA "red-flag checklist" provided to Mr. Truong did not "advise him that he was supposed to do that, the Google search" ROA.3369. "There is no rule in the state of Texas that for every prescription that comes into a pharmacy, they have to go to the DEA website to see if an existing DEA number just retired." ROA.3045-3046.

Dr. Durand testified that the phone number included on Government Exhibit 3 and 4 (the Durand prescriptions) was not the same as that for his office.

ROA.2663-2664. He testified that he, himself, called the number in an attempt to figure out who had stolen his DEA number. When he did so, the person who answered the phone identified themself as Dr. Durand. ROA.2669. Dr. Durand agreed that "he [knew], from [his] own experience, that when [he] called that number, someone answered purporting to be [him] or from [his] office." ROA.2669-2670 ("So you understand, from your own personal experience calling that number, that if someone, like a pharmacist, had done what you did to check on a prescription, they might have gotten that same kind of person on the phone, right? A It's possible. … Q Person trying to verify a fake prescription without them knowing, right? A Correct.").

As relates to the prescriptions charged in Counts Three and Four, the defendant *did* call to verify the charged prescriptions with a person he believed to be Dr. Durand. On the back of those prescriptions the defendant wrote down the patient's ailment and the justification for the prescription. ROA.3415, Ex. 4 ("Hx severe lower back pain seven of ten"); Id. "Spinal disk injury, pain five of ten." Id. ("Muscle cramps and pain six of ten"); Id. ("DJD, pain six of ten."); Id. "Severe lower back pain, seven of ten."). The notes do not suggest a simple call where the person on the other line simply said that all the prescriptions were valid. Rather in Mr. Truong's notes on the prescriptions, "individualized patient information differs depending on which patient it is." ROA.3417. "Mr. Truong is not only looking at

the prescriptions and checking off these items, but he's also taking the time to note on the bottom individualized patient information." ROA.3417.

The government called Kathy Salinas as their expert witness in pharmacy practices. Ms. Salians is a licensed pharmacist and formerly worked as a compliance officer the with the Texas Board of Pharmacy. ROA.3248-3250. As a compliance officer, she was particularly knowledgeable about the evolving security features Texas placed on written prescriptions. ROA.3359-3360 ("Q Yes, but given your experience working in that capacity, you are particularly knowledgeable about the rules, right?"); Id. ("Q As a staff member for the esteemed actual members of the board, you were always up-to-date on the security features, right? A Yes.").

Ms. Salinas testified that pharmacist has to ensure that an actual patient is receiving the drug they are dispensing and this "usually involves checking the patient's ID and talking with the patient to make sure that that correct patient is getting the correct medication. ROA.3270-3271. When a pharmacist receives a prescription, he or she should examine the face of the prescription to determine "is that appropriate dose as indicated, the quantity, if anything is missing, where the patient is located, where the doctor is located, if there's anything odd or that they need to clarify." ROA.3270. "If there are any potential problems that they see, they need to resolve that red flag." ROA.3270; ROA.3287-3288 ("I tell them that if

they do see any of the items listed on the red flags checklist, they need to try to resolve the red flag if possible.”).

Ms. Salinas also testified that a pharmacist is required to offer a patient counseling. “Counseling is a dialogue that the pharmacist must have with the patient for all new prescriptions that involve what the medication is typically indicated for, how to take that medication, how to store that medication, what to do if you miss a dose, maybe things that you should avoid while taking the medication, that sort of thing.” ROA.3271. Though this requirement seems slightly more aspirational than actual. Ms. Salinas admitted that “40 to 50 percent of … prescriptions are picked up by agents rather than by the person themselves”. ROA.3407.

Ms. Salinas acknowledged that a pharmacist may rely on pharmacy staff to perform many of these functions. ROA.3415 (agreeing that “in reality, the staff could talk to the patient; give information to the pharmacist,”); ROA.3409 (“ Q The pharmacist could charge them with doing that and rely on them doing that, right? A Yes”).

Ms. Salinas conducted the pre-inspection review of S&S Pharmacy with Mr. Truong in December of 2017. ROA.3286. Ms. Salinas testified that she provided the Texas Board of Pharmacy “red-flag checklist” (Gov. Ex. 6) to Mr. Throng at the pre-inspection. ROA.3287.

Ms. Salinas pointed out that the prescriptions charted in counts Two, Three, and Four exhibited several red flags. They were "for controlled substances with popularity as street drugs, such as opioids, benzodiazepines, muscle relaxants, psychostimulants and/or cough syrups or any combination of these drugs." ROA.3277-3278 (number 3). The prescriptions were "for the highest strengths of the drug and/or for large quantities." ROA.3278 (number 5). However, as Ms. Salinas acknowledged "There is no prohibition from the FDA on the prescription of four hydrocodone, 10 milligrams per day for 30 days.". ROA.3374.

The red flags included in the handout are not prohibitions on filling a prescription. ROA.3366 ("Q And, in fact, the presence of a single red flag does not -- does not mean that a pharmacist is prohibited from filling a prescription, does it? A It means that the pharmacist has to resolve that"). The state of Texas does not prohibit a pharmacist from filling prescriptions even in the face of multiple red flags. ROA.3367. "A red flag is something that should make anyone stop and evaluate to determine if that's a problem or if they can proceed." ROA.3277.

Ms. Salinas testified that a pharmacist can resolve a red flag in "any number of different ways." ROA.3277. A pharmacist can "call the prescriber's office," ROA.3368. "In addition to contacting the prescriber's office, another way to try to verify legitimacy is to check identification of the patient." ROA.3368. "One way

is to check PMP data." ROA.3368. "One way is to verify the DEA number for the prescriber." ROA.3368-3369. Mr. Truong was taking each of those steps.

Following the close of the government's case-in-chief and again following the verdict, the defendant argued that the government presented insufficient evidence of his mental state. ROA.3608. The district court denied both motions. ROA.3610; EOR p. 87.

## C. JURY INSTRUCTIONS

The jury instruction conference begins at ROA.3612.

The elements instruction issued by the district court required the government to prove:

> "First, that the defendant distributed or dispensed a controlled substance;
> Second that the defendant did so knowingly or intentionally;
> Third, that the defendant was not authorized to distribute or dispense the controlled substance; and
> Fourth, that the defendant knew or intended that his conduct was unauthorized when he distributed or dispensed the controlled substance."

ROA.875-876. Over the defendant's strong objections, ROA.3629, the district court went on to define "authorized" as dependent upon the language of 21 CFR §1306.04, and the pharmacist's understanding of the physician's actions.

> "A prescription is 'not authorized' or 'unauthorized' if the prescription either lacks a legitimate medical purpose or was written outside the usual course of professional practice. A pharmacist's conduct is unauthorized, or he acts in an unauthorized manner, if he distributes or dispenses a controlled substance that he knows was not prescribed for a legitimate medical purpose or that he knows was not

> prescribed by a practitioner acting in the usual course of professional treatment".

ROA.876. ROA.3623-3624; ROA.3629-3630 (district court ruling). The defendant's proposed instruction would have required the government to prove that the defendant knew that he, as a pharmacist, did not have the authorization under the CSA to fill the charged prescriptions.

> "A finding that the Defendant filled a forged prescription, by itself, is not sufficient for a finding of guilt. For you to find the Defendant guilty on a given Count, you must find both that the Defendant knew that the prescriptions charged in the Count were illegitimate and that the Defendant knew or intended that he was legally unauthorized to fill the prescriptions."

ROA.734. The defendant also requested an instruction that would have clarified that negligence, malpractice, or a failure to investigate "red flags" was not sufficient to establish guilt:

> "It is not enough for the Government to prove any degree of negligence, malpractice, foolishness, carelessness, or sloppiness on the part of the Defendant, and it is not enough for the Government to show Defendant Hieu "Tom" Truong violated a pharmacy board regulation. You cannot convict Defendant Hieu "Tom" Truong if all the Government proves is that he is an inferior pharmacist or that he failed to attempt to apply the appropriate standard of care in practicing pharmacy. Similarly, you cannot convict Defendant Hieu "Tom" Truong if all the government shows is that he failed to adequately investigate or address "red flags".
>
> This is a criminal case, and you must apply the instructions I am giving to you to determine whether Defendant Hieu "Tom" Truong is guilty of any of the crimes with which he is charged beyond a reasonable doubt. And for you to find the Defendant guilty on a given count, you must find both that the Defendant knew the prescriptions

> charged in that count were illegitimate and that the Defendant knew or intended that that filling the prescriptions was legally unauthorized under the federal Controlled Substances Act.

ROA.735. The district court did not give that instruction and instead instructed the jury that failure to abide by Texas Board of Pharmacy regulations was not sufficient to establish guilt. ROA.872-873; ROA.3629 (" Okay. And then just picking up where we left off about the instruction regarding "no amount of negligence, carelessness," what we had proposed earlier, we object to the noninclusion of that, since we're doing official objections. THE COURT: Okay. I'm overruling that.").

## SUMMARY OF THE ARGUMENT

1. The appellant understands that any argument for insufficiency of the evidence faces an uphill battle. Here, however, the evidence is completely contrary to a finding of guilt. It is undisputed that the putative co-conspirators and masterminds of the scheme never told Mr. Truong that the prescriptions presented to him were counterfeit. Indeed, it is undisputed that those individuals actively worked to shield Mr. Truong from that knowledge. It is undisputed that Mr. Truong imposed a number of procedures and safety checks that had the intent to, and sometimes did, prevent counterfeit prescriptions from being filled. It is undisputed that others actively worked to undermine those procedures.

While the government may rely on "reasonable" inferences from circumstantial knowledge to establish a defendant's guilty state of mind, those inferences must be "reasonable;" they cannot be "speculative" or "attenuated." The district court determined that a willful blindness instruction was not justified in this case. ROA.3614.

The government did not establish that the defendant took any action to shield himself from what he obviously must have known. The government did not establish that Mr. Truong had any special knowledge about the prescription issued on July 23, 2019, such that there was any unique way he could have known that those specific prescriptions were illegitimate. There is no chain of vaguely rational inferences that could lead a jury to find that the defendant knew the charged prescriptions to be counterfeit beyond a reasonable doubt.

2. The jury instructions issued in this case did not accurately define what it means for a pharmacist to act in an "unauthorized manner" as that term is used in § 841 of the Controlled Substances Act ("CSA"). Nor did the instructions capture the specific intent requirement imposed by the Supreme Court in *Ruan v. United States*.

In *United States v. Lamartiniere*, 100 F.4th 625, 636 (5th Cir. 2024), this Court held that *Ruan* did not disturb this Court's prior precedent holding that the definition of authorization for a physician issuing a prescription was defined by

CFR §1306.04. In *Lamartiniere* this Court further found that jury instructions based on the language of CFR §1306.04 were justified despite an argument that such instructions violate the non-delegation doctrine and major questions doctrine. *Lamartiniere* arrived at that conclusion by stating that, as applied to physicians, CFR §1306.04 was merely a parroting regulation. The appellant maintains that *Lamartiniere* was wrongly decided.

More importantly, the reasoning of *Lamartiniere* makes sense only in the context of a physician issuing a prescription. The reasoning of *Lamartiniere* does not hold where a pharmacist is charged with filling a prescription written by a licensed physician. The jury instructions in this case require any pharmacist who fills a prescription to second guess the methodology of a medical doctor who issues it. While that may be a purported requirement of CFR §1306.04, it appears at no place in the CSA itself. At most, the CSA only requires that pharmacists act within the usual course of *pharmacy* practice.

## ARGUMENT

### I. THE GOVERNMENT DID NOT PRESENT SUFFICIENT EVIDENCE TO ESTABLISH THAT MR. TRUONG KNEW THE CHARGED PRESCRIPTIONS TO BE COUNTERFEIT.

#### A. Standard of Review

"Where a defendant properly preserves a sufficiency challenge … the court reviews the challenge de novo." *United States v. Martinez*, 131 F.4th 294, 308 (5th Cir. 2025); *United States v. Davis*, 53 F.4th 833, 842 (5th Cir. 2022).

**B. Argument**

"The court will uphold the jury's verdict if 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Martinez*, 131 F.4th at 308 (*quoting United States v. Daniels*, 723 F.3d 562, 569 (5th Cir. 2013) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A jury is allowed to "choose among reasonable constructions of the evidence." *Id.* (*quoting United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994)).

However, a jury's verdict must be reasonable. *United States v. Miles*, 360 F.3d 472, 478 (5th Cir. 2004) (vacating a jury conviction when "a rational jury could not find" an essential element of the crime). *United States v. Oti*, 872 F.3d 678, 686 (5th Cir. 2017) ("Our inquiry is limited to whether the jury's verdict was reasonable, not whether we believe it to be correct."). Courts must consider "whether the inferences drawn by a jury were rational, as opposed to being speculative or insupportable, and whether the evidence is sufficient to establish every element of the crime." *United States v. Vargas-Ocampo*, 747 F.3d 299, 302 (5th Cir. 2014).

"[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996). "[A] conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980).

Defendants always face an uphill battle when arguing sufficiency of the evidence. In this case, however, the defendant isn't asking this Court to engage in reevaluating the credibility of any witness. The evidence was overwhelming on the side of innocence. No reasonable inference from the evidence could support the defendant's guilt.

It simply does not make sense for Kathy and Diana Hernandez to have gone through such pains to fake medical histories, recruit people to pretend to be doctors, and alter Drug Use Reports and daily dispensing logs, if Mr. Truong was aware the prescriptions were counterfeit. See ROA.3014, ROA. 3018, ROA.3020, ROA.2673. Nor does it make sense for Mr. Truong to go through the effort of checking all those documents, refusing to fill numerous prescriptions, and report a prescription to the DEA, if he was in the know. ROA.3014, ROA.3042, ROA.3104. Under the sufficiency of the evidence standard the government may have the benefit of any "rational" inferences from the evidence. It does not get the benefit of those that are "speculative or insupportable." *Vargas-Ocampo*, 747

F.3d at 302. "[U]nanswered" and uncontested evidence favorable to the defense can justify finding of insufficiency. *United States v. Ganji*, 880 F.3d 760, 771 (5th Cir. 2018).

The appellant suspects that the government will respond that it is possible Mr. Truong knew and that the Hernandez sisters did not know he knew. The government might attempt to argue that the various quality control measures he forced upon the Hernandez sisters were simply him making cover for a crime he knew was happening. That is mere unsupported speculation. In fact, it is extremely counterintuitive and self-defeating speculation. That is the equivalent of saying "the defendant looks innocent, and everyone acted as if he was innocent, so he must be guilty."

The government may argue that the defendant did not follow up on "red flags" or do as much as he should have done to confirm the legitimacy of the prescriptions. In this case, the district court did not issue the willful blindness instruction. ROA.3614. In other words, the district court did not believe that there was sufficient evidence to prove that any action Mr. Truong had refused to take was for the sake of protecting himself from learning discovering the illegitimate nature of the charged prescriptions.

Regardless, could a jury *rationally* infer from any action not taken to verify the prescriptions that the defendant knew the prescriptions to be counterfeit

(especially in the context of the many above detailed actions he did take in an attempt to verify the prescriptions)? *Ganji*, 880 F.3d at 777 ("We acknowledge that the Government presented evidence of [defendant's] participation in lax practices. However, [defendant]was not convicted of patient negligence, keeping subpar files, or haphazardly conducting her business.").

The government may argue that Appellant did not routinely check to determine whether the RX label on the prescriptions was heat sensitive. In Texas Schedule II controlled substance prescriptions are issued on forms that bear a heat sensitive mark that will fade when heat is applied (by, for example, rubbing it with a finger). ROA.3273-3274. On January 15, 2019, Mr. Salinas received a notice from the Texas Pharmacy Board informing pharmacists that as of June 2019:

> "The new security features include a true watermark which is pressed into the paper and is visible from either side in regular light. This feature resists photocopying and scanning. Additionally, the thermochromic ink which was previously on the back of the form, as a red check, is now on the front of the form as an Rx symbol. This feature can be verified by rubbing the red Rx symbol with the fingers at which time it should fade and then reappear."

ROA.3274; ROA.3275-3276.

On June 17, 2019, Mr. Truong noticed that the watermark on a prescription was not fading. ROA.3177; ROA.3180. Mr. Truong brought it to Ms. Kathy Hernandez's attention. ROA.3034. Ms. Kathy and Diana Hernandez memorialized this discovery in text messages:

> "June the 17th, 2019, first line, you to Diana. 'Well Tom caught on.' 'With Ced papers lol they don't fade,' correct? A. Correct."

ROA.3180. Before June of 17, 2019 Mr. Truong had not noticed the fact that the watermark on the prescriptions counterfeited by the drug dealers did not fade. ROA.3180 ("Q. So before June of 2019 apparently according to what you're saying here, he didn't know, right? A. Yes."). Because Mr. Truong noticed the error in the paper, one of the street level dealers (Dex) had to go out and obtain different prescription paper that did fade. Ms. Hernandez texted her sister "You say to Diana: (Reading) Dex came in with a script to see if paper was good. It works. Red X -- Rx fades, and Tom saw it and said yes." ROA.3035. They had to try one to see if Mr. Truong would accept it or not. Because Mr. Truong had not flagged that prescription as bad, Dex was ready to work again. ROA.3035-3036.

It is not a rational inference to assume that he did not check *because* he suspected that the prescriptions were counterfeit and did not want to find out. If so, why would he then present the problem in June 17, 2019, to Ms. Kathy Hernandez and at that point refuse to fill the prescription?

As the government is likely to point out:

> "The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. … As we have said before, 'the more unreasonable' a defendant's 'asserted beliefs or misunderstandings are,' especially as measured against objective criteria, 'the more likely the jury ... will find that the Government has carried its burden of proving knowledge.' *Cheek v. United States*, 498 U.S. 192, 203–204, (1991). But the Government must still carry this

> burden. And for purposes of a criminal conviction under §841, *this requires proving that a defendant knew or intended that his or her conduct was unauthorized*."

*Ruan*, 597 U.S. 467 (emphasis added). That is true. But the government can only establish an element "through circumstantial evidence *if* 'each link in the inferential chain [is] clearly proven.'" *Martinez*, 131 F.4th at 308–09 (*emphasis added*) (*quoting United States v. Burton*, 126 F.3d 666, 670 (5th Cir. 1997)).

The government argued that the prescriptions looked fake. But they could not prove that Mr. Truong, who had no experience with written prescriptions or retail pharmacy, knew what legitimate prescriptions looked like. Each link in "inferential chain" has not been "clearly proven."

At least in the second trial, this was not a conspiracy case. The government did not establish that Mr. Truong was aware that *every* prescription, or the bulk of prescriptions filled at S&S Pharmacy were illegitimate. Indeed, the jury in the second trial acquitted Mr. Truong of Count Two (the earlier prescription). The counts of conviction occurred on a single day. The government did not present any evidence suggesting that Mr. Truong was aware of any unique fact on that day that would justify a finding that he had knowledge those specific prescriptions were counterfeit. To be sure those prescriptions were bundled together in a single bag. But the government did not present any evidence that Mr. Truong was aware of that fact. The Hernandez sisters went out of their way to ensure that Mr. Truong

was not in the front of the pharmacy when prescriptions were dispensed. ROA.3166 ("Q. And then Diana says 'Tom shouldn't even be hearing you. Shouldn't know nothing when it comes to bagging. If he's around her when it's time to get out the bags, then wait and tell them to come back. If he's around when she want to bag, don't bag."). The Hernandez sisters shielded Mr. Truong from learning that groups of prescriptions were dropped off or picked up by a single individual.

> "Q. Okay. But Tom's not there most of the time when the prescriptions are dropped off, right? He's not at the front most of the time?
> A. No.
> Q. Okay. So Tom doesn't necessarily know whether those prescriptions are all dropped off at once by one person or not, does he?
> A. No.
> …
>
> Q. You told Tom patients come individually to turn in and pick up, right?
> A. Yes."

ROA.3237-3238.

To be sure, a defendant's knowledge can be established by circumstantial evidence and "[w]hat people do is logical, albeit, circumstantial, evidence of what lies in their mind." *Ganji,* 880 F.3d at 768. But that must necessarily work in both directions. The evidence shows that what Mr. Truong *did* was to actively put into place a number of safeguards that seem, for all the world, intended to honestly

identify illegitimate prescriptions. *See*, ROA.3236 ("Q. We know he was still calling the number to try to verify two weeks before they shut it down, right? A. Correct.).

This is not simply a case where purported co-conspirators "spoke of their own fraudulent actions, but they never testified that they agreed [with the defendant] to carry out these activities." *Ganji*, 880 F.3d at 770. This is a case where codefendants actively attempted to hide the scheme from Mr. Truong. This is a case where Mr. Truong, while unaware of the scheme, actively attempted to undermine it. "[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." Id. (*quoting*, *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996).

## II. JURY INSTRUCTIONS ISSUED IN THIS CASE DID NOT CAPTURE THE FULL *MENS REA* REQUIRED BY *RUAN V. UNITED STATES* NOR CORRECTLY STATE THE STANDARD FOR DETERMINING WHEN A PHARMACIST ACTS IN AN UNAUTHORIZED MANNER IN FILLING A PRESCRIPTION.

### A. Standard of Review

This Court reviews "a district court's refusal to provide a requested jury instruction for an abuse of discretion." *United States v. Ferris*, 52 F.4th 235, 239 (5th Cir. 2022). "However, when a jury instruction hinges on a question of statutory construction, this court's review is *de novo.*" *United States v. Lamartiniere*, 100 F.4th 625, 636 (5th Cir. 2024) (internal quotation omitted).

The Court "consider[s] whether the jury instruction, taken as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Patterson*, 431 F.3d 832, 837 (5th Cir. 2005) *(quoting United States v. McKnight,* 953 F.2d 898, 901 (5th Cir.1992)). Where the defendant argues that an instruction misstates an element of the offense, "review is *de novo*." *Ferris*, 52 F.4th at 239.

A. **Argument.**

Both before and after trial Mr. Truong objected to the court defining authorization as dependent upon the language of 21 CFR 1306.04. ROA.844-855; ROA.3629-3630. ROA.3629-3630. Mr. Truong also objected to determining a pharmacist's culpability based on his knowledge of a doctor's medical practice. ROA.3624-3625; ROA.3629-3630.

Mr. Truong maintains that reliance on § 1306.04 to define the term "authorization" as used in the CSA does not capture the full *mens rea* required by *Ruan* and constitutes a violation of the separation of powers and major questions doctrine. Concededly, this Court largely resolved that question in *United States v. Lamartiniere*, 100 F.4th 625, 637–38 (5th Cir. 2024). For the purposes of preserving the issue, Mr. Truong maintains that *Lamartiniere* was wrongly

decided. *Lamartiniere* involved a physician charged with issuing an unauthorized prescription. The instant case involves a pharmacist charged with filling an unauthorized prescription. The instructions in this case defined "authorization" as dependent upon the physician's conduct, not the conduct of the pharmacist. This places on the pharmacist an obligation to second guess the treating physician in a way that is inconsistent with *Ruan* and the language of the CSA even if it is consistent with the language of the CFR. Even if the CFR is an appropriate means of defining "authorization" as applies to physicians who issue prescriptions, it does not and cannot define authorization as it applies to pharmacists who fill those prescriptions.

### 1. For the sake of preserving the issue Mr. Truong maintains that *Lamartiniere* was wrongly decided.

Section 841 reads:

> "*Except as authorized* by this subchapter, it shall be unlawful for any person knowingly or intentionally… to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

21 USCA §841 (emphasis added). Under *Ruan*, 597 U.S. at 461 this requires the government to prove that (1) the charged prescriptions were "unauthorized" as that term is used in §841 and (2) the defendant knew the charged prescriptions were unauthorized. *Id*. at 467 ("[F]or purposes of a criminal conviction under § 841, this requires proving that a defendant knew or intended that his or her conduct was

unauthorized.”); *Id*. 454 (“We hold that the statute's ‘knowingly or intentionally’ *mens rea* applies to authorization.”).

In reaching this result, the Court explicitly drew the parallel between the *mens rea* standard applicable in *Liparota* and the *mens rea* standard applicable to medical practitioners charged under §841:

> In *Liparota*, we interpreted a statute penalizing anyone who ‘knowingly uses [food stamps] in any manner not authorized by’ statute…. We held that ‘knowingly’ modified both the ‘use’ of food stamps element and the element that the use be ‘not authorized.’ ... We applied ‘knowingly’ to the authorization language even though Congress had not ‘explicitly and unambiguously’ indicated that it should so apply.’

*Ruan,* 597 U.S. at 460-461. *Liparota* involved the standard necessary to convict a defendant under 7 USC §2024(b)(1) for “unauthorized” use of food stamps. *Liparota v. United States*, 471 U.S. 419, 430 (1985). The Supreme Court held that to obtain a conviction under §2024(b)(1) the government must prove “that petitioner knew that his conduct was unauthorized or illegal.” *Id*.434. The defendant in *Liparota* did purchase food stamps at below the market rate from an undercover government agent. *Id.*421–22. Furthermore, the defendant *knew* he was purchasing food stamps below the market rate. *Id*. The Supreme Court found that this was not enough to establish guilt. Knowingly engaging in conduct that is, in fact, unauthorized is insufficient, even if one is aware of all the factors that render it unauthorized. *United States v. Kahn*, 58 F.4th 1308, 1315 n.3 (10th Cir. 2023)

(*Kahn II)* ("The Supreme Court held that knowingly engaging in engaging in conduct that is, in fact, unauthorized is not sufficient, even if one is aware of all the factors that render it unauthorized"). Instead, the government must also prove that the defendant actually knew his conduct to be unauthorized.

The Supreme Court relied on *Cheek* in determining the appropriate standard.

> The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. … As we have said before, "the more unreasonable" a defendant's "asserted beliefs or misunderstandings are," especially as measured against objective criteria, "the more likely the jury ... will find that the Government has carried its burden of proving knowledge." *Cheek v. United States*, 498 U.S. 192, 203–204, (1991). But the Government must still carry this burden. And for purposes of a criminal conviction under §841, *this requires proving that a defendant knew or intended that his or her conduct was unauthorized*."

*Ruan*, 597 U.S. at 467 (emphasis added). Cheek is a strict liability case.

Mr. Truong, consistent with the Tenth Circuit's decision in *United States v. Kahn* maintains that *Ruan* articulates something close to a specific intent standard. That is, the government must prove that the defendant filled a prescription that he knew he was not authorized by the CSA to fill. *Kahn II*, 58 F.4th at 1315. "Further, the Supreme Court ruled that, to establish *mens rea*, it is insufficient for the government to prove that a defendant acted without 'a legitimate medical purpose' or outside the 'usual course' of generally recognized 'professional practice.'" *Kahn II*, 58 F.4th at1314 (quoting *Ruan,* 597 U.S. at 467). Indeed,

"*Ruan* treats the two criteria in § 1306.04(a) not as distinct bases to support a conviction, but as 'reference to objective criteria' that may serve as circumstantial evidence of a defendant's subjective intent to act in an unauthorized manner." *Id.* at 1316 (quoting *Ruan,* 597 U.S. at 467). "But the Government must still carry its burden . . . [of] proving that a defendant knew or intended that his or her conduct was unauthorized." *Ruan*, 597 U.S. at 467.

The instructions issued in this case did not require the government to prove that the defendant knew he was not authorized by the CSA to fill the charged prescriptions. Rather, the instructions in this case only required the government to prove that he knew the doctor who issued the prescriptions was either acting outside the usual course of professional practice or without a legitimate medical purpose.

> "A prescription is 'not authorized' or 'unauthorized' if the prescription either lacks a legitimate medical purpose or was written outside the usual course of professional practice. A pharmacist's conduct is unauthorized, or he acts in an unauthorized manner, if he distributes or dispenses a controlled substance that he knows was not prescribed for a legitimate medical purpose or that he knows was not prescribed by a practitioner acting in the usual course of professional treatment".

ROA.876. The instructions issued in this case required the government to prove that the defendant knew the prescriptions had the characteristics upon which the CFR conditions "authorization." It did not require the government to prove that

the defendant actually knew that those characteristics rendered the prescription one that he was not authorized by the CSA to fill.

Furthermore, reliance on the CFR to define authorization violates the non-delegation and major question doctrine. Section 841 states "[e]xcept as authorized *by this subchapter*." 21 USC §841. It does not say: "except in conformity with regulations promulgated by the attorney general." Those statutes do exist. *See Liparota*, 471 U.S. at 430. The CSA is no such statute.

"Only the people's elected representatives in the legislature are authorized to 'make an act a crime.'" *United States v. Davis*, 588 U.S. 445, 447-8 (2019). The authors of the CSA made clear that they did not intend to grant the executive the authority to regulate the method of medial practice. "Nothing in such regulations or practice guidelines may authorize any Federal official or employee to exercise supervision or control over the practice of medicine or the *manner* in which medical services are provided." 21 U.S.C. §823(g)(2)(H)(i) (emphasis added). The House report states that Congress did not believe it appropriate for "federal officials to determine the appropriate *method* of the practice of medicine". H.R. Rept. 91-1444 at 14.

> Since the passage of the Harrison Act of 1914, the Federal Narcotics laws have expressly permitted a physician to prescribe narcotic drugs for a patient in the course of "professional practice only" and for "legitimate medical uses" and "legitimate medical purposes." *Under this statutory language there is no doubt that a physician may prescribe narcotic drugs for a patient suffering from acute pain or from a painful*

> *and incurable disease*. But controversy has existed for 50 years over the extent to which narcotic drugs may be administered *to an addict solely because he is an addict.*"

H.R. Rept. 91-1444 at 14. (quoting Prettyman Comms'n. Report).

Under the Major Questions Doctrine, courts must presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *W. Virginia v. Env't Prot. Agency,* 142 S. Ct. 2587, 2609 (2022) (*quoting United States Telecom Assn. v. FCC*, 855 F.3d 381, 419 (CADC 2017) (Kavanaugh, J., dissenting from denial of rehearing *en banc*)."Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted." *Id.* 2607–08. This presumption applies even where there is a "colorable textual basis" supporting the executive's claim of regulatory authority. *Id.* 2609.

Indeed, the House Committee Report indicated that it expected that guidance on treatment from the Secretary of Health, Education, and Welfare would "clarify for the medical profession the conditions under which narcotic drugs may be issued for the medical treatment of narcotics addicts." *Id.* Congress then enacted specific provisions delineating standards applicable to physicians who seek to issue prescriptions for the purpose of treating addiction. *See,* e.g., 21 U.S.C. § 823(g).

Courts must "be certain of Congress's intent" before "legislating in areas traditionally regulated by the States" *Gregory v. Ashcroft*, 501 U.S. 452, 459-60 (1991). The regulation of medical practice is an area of traditional state concern that the federal Congress has been (perhaps uncharacteristically) inclined to protect. *Hawker v. New York*, 170 U.S. 189 (1898) (detailing how the medical practice had been policed by the states); 21 U.S.C. § 823(g)(2)(H)(i); *See* 42 U.S.C. § 1395 ("Nothing in this subchapter shall be construed as to authorize any federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided."); *Bond v. United States*, 134 S. Ct. 2077, 2088 (2014) (rejecting presumption "that Congress had meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction.").

Even were a contrary construction possible, §§ 821 and 871 fall far short of providing an "intelligible principle" guiding the delegation of that power. *United States v. Touby*, 500 U.S. 160, 166 (1991). Separation of Powers requires that where Congress delegates rulemaking authority to the executive branch, it must "clearly delineate[] the general policy, the public agency which is to apply it, *and the boundaries of this delegated authority*." *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105, (1946) (emphasis added). *United States v. Robel*, 389 U.S. 258, 275 (1967)

(Brennan, J., concurring) ("The area of permissible indefiniteness narrows … when the regulation invokes criminal sanctions[.]"); *Crandon v. United States Boeing Co., Inc.*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring) (noting that prosecutors have "a very specific responsibility" to interpret a statute "in order to decide when to prosecute" but that is not entitled to deference); *Touby*, 500 U.S. at 166 (assuming that "greater congressional specificity is required in the criminal context."); *Fahey v. Mallonee*, 332 U.S. 245, 249 (1947) (noting a stricter standard for the "delegation of a power to make federal crimes of acts[.]")

The *Ruan* Court emphasized that "the regulatory language defining an authorized prescription is . . . 'ambiguous,' written in 'generalities, susceptible to more precise definition and open to varying constructions.'" *Ruan*, 597 U.S. at 459 (quoting *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006)) (brackets omitted); *see also id.* at 2378 ("The conduct prohibited by such language (issuing invalid prescriptions) is thus often difficult to distinguish from the gray zone of socially acceptable conduct (issuing valid prescriptions)." (internal quotation marks and ellipsis omitted)). Indeed, the *Ruan* Court listed "the vague, highly general language of the regulation defining the bounds of prescribing authority" as a reason for applying the *mens rea* to the "*statutory* requirement" of authorization. *Ruan*, 597 U.S. at 459 (emphasis added). Thus, in the prosecution of a medical professional under § 841, the government is required to prove that the "defendant

*knew or intended* that his or her conduct was *unauthorized*." *Ruan,* 597 U.S. at 467.

### 2. EVEN IF *LAMARTINIERE* WERE CORRECTLY DECIDED, DEFINING WHAT IT MEANS FOR A PHARMACIST TO ACT IN AN AUTHORIZED MANNER BASED ON THE LEGITIMACY OF A PHYSICIAN'S MEDICAL PRACTICE IS INCONSISTENT WITH *RUAN* AND THE LANGUAGE OF THE CSA.

In *Lamartiniere,* this court noted that ""[s]ection 822(b) defines the scope of authorization under the Act in circular terms." *United States v. Lamartiniere*, 100 F.4th 625, 637–38 (5th Cir. 2024); 21 U.S.C. § 822(b) (Providing that medical practitioners "are authorized to possess, manufacture, distribute, or dispense" controlled substances "to the extent authorized by their registration and in conformity with the other provisions" of the Controlled Substances Act ("CSA"). The *Lamartiniere* Court relied on *Gonzales v. Oregon* for the proposition that § 1306.04(a) constitutes "a parroting regulation" because it "just repeats two statutory phrases [from the CSA] and attempts to summarize the others." *United States v. Lamartiniere*, 100 F.4th 625, 637–38 (5th Cir. 2024). Specifically, "21 U.S.C. § 812(b); requires a 'medical purpose' for dispensing the least controlled substances of those on the schedules, § 829(c); and, in its reporting provision, defines a '*valid prescription*' as one 'issued for a legitimate medical purpose,' § 830(b)(3)(A)(ii) ... [and] physicians are considered to be acting as practitioners under the statute if they dispense controlled substances 'in the course of professional practice[,]' § 802(21)." 21 USC 802(21) defines a "practitioner" as

any "physician, … pharmacy, hospital, or other person licensed, registered, or otherwise permitted, … to distribute, [or] dispense, .. a controlled substance in the course of professional practice or research."

Section 1306.04 may be a simple parroting statute as applies to physicians. But it goes beyond that when applied to pharmacists. Under §1306.04:

> "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

21 C.F.R §1306.04. No where does the CSA place upon pharmacists a "corresponding responsibility" to ensure that a prescription is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." What the CSA requires is that a pharmacist act within what he or she bleives to be the "usual course of professional practice" *of a pharmacist*. 21 UC 802(21) defines a "practitioner" as any "physician, … pharmacy, hospital, or other person licensed, registered, or otherwise permitted, … to distribute, [or] dispense, .. a controlled substance in the course of professional practice or research.". 21 USC 802(21).

In *United States v. Capistrano*, a defendant pharmacist argued under plain error review that the district court erred "by 'tethering the pharmacist's criminal liability to a doctor's misconduct.'" *United States v. Capistrano,* 74 F.4th 756, 772 (5th Cir. 2023) The defendant argued that "the instructions exclusively address doctors' practices and not pharmacists' practices and that any doctor's unauthorized act—whether known or unknown by the doctor or pharmacist—could be imputed to a pharmacist." *Id.* There the Court sated that it could not find plain error because "reasonable minds can differ as to whether the instructions impute doctors' misconduct to pharmacists, as the instructions simply ask the jury to consider each defendant's "usual course of professional practice." *Capistrano,* 74 F.4th at 772.

Here the instructions explicitly defined authorization based on whether the *physician* was acting in the usual course of professional practice regardless of whether the pharmacist was otherwise doing his best to act in an authorized manner. ROA.876 ("A pharmacist's conduct is unauthorized, or he acts in an unauthorized manner, if he distributes or dispenses a controlled substance that he knows was not prescribed for a legitimate medical purpose or that he knows was not prescribed by a practitioner acting in the usual course of professional treatment".).

As it relates to pharmacists, the regulation creates a new requirement not required under the statute. The statute nowhere imposes a "corresponding

responsibility" on a pharmacist. The CSA does not contemplate a pharmacist second-guessing a doctor's prescribing decisions. This is evident from the text of 21 U.S.C. § 829(a).

The "usual course of professional practice" and "legitimate medical purpose" language of the CFR are uniquely unfitting in the context of 841 charges against a pharmacist. As interpreted by the district court, a pharmacist's guilt does not turn on whether they followed all the procedures they were required to follow (i.e. believed they were acting within the usual course of pharmacy practice), or whether they believed the medication to be legitimate for the purported purpose (i.e. believed the prescriptions they were filling were serving a legitimate medical purpose). Instead, the instructions issued in this case require that the defendant question the methodology and motivations of the treating physician.

The CSA does not say that a pharmacist has the authority, let alone the obligation, to question the methodology or motives of a treating physician. A pharmacist has not gone to medical school. *Ruan* requires that the government prove that a defendant knew or intended that his or her conduct was unauthorized." *Ruan*, 597 U.S. at 467.

It is entirely plausible for a pharmacist to have lingering doubts about the judgement of a physician and still believe that they, they pharmacist, are authorized, and perhaps obligated, to fill the prescription presented to them.

Does refusing to second guess a physician really render a pharmacist a drug dealer? The instructions in this case say that it does.

## CONCLUSION

Wherefore, Defendant-Appellant Hieu Truong asks that this Court vacate his conviction and remand to the district court with instructions that a judgment of acquittal be entered or, in the alternative, that a new trial be granted.

Respectfully Submitted,

Hieu Truong

By: s/ Beau B. Brindley

LAW OFFICES OF BEAU B. BRINDLEY
53 West Jackson Blvd.
Suite 1410
Chicago, Illinois 60604
312.765.8878

## RULE 32 CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the Court's granted motion for excess words because this brief contains 11,428 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(iii).

This brief complies with the typeface and style requirements of Fed. R. App. P. 32(a) and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using 14-point Times New Roman in Microsoft Word.

Respectfully submitted,

By: /s/ Beau B. Brindley
Attorney for Defendant-appellant

The Law Offices of Beau B. Brindley
53 W Jackson Blvd. #1410
Chicago, Illinois 60604
(312) 765-8878

**CERTIFICATE OF SERVICE**

I, Beau B. Brindley, hereby certify that I caused a true and accurate copy of the attached BRIEF OF DEFENDANT-APPELLANT HIEU TRUONG to be served upon the government by electronically serving it through the CM/ECF system December 19, 2025.

Respectfully submitted,

By: /s/ Beau B. Brindley
Attorney for Defendant-appellant

The Law Offices of Beau B. Brindley
53 W Jackson Blvd. #1410
Chicago, Illinois 60604
(312) 765-8878